1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| JAMES WILLIAMS, JR., | Civil No.    13cv2070-JAH (JLB) |
| Petitioner, | |
| vs. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| DAVID LONG, Warden, | |
| Respondent. | |

18       This Report and Recommendation is submitted to United States District Judge John A.

19 Houston pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

20 District Court for the Southern District of California.

21                                             **I.**

22                            **FEDERAL PROCEEDINGS**

23       James Williams, Jr. (hereinafter "Petitioner"), is a state prisoner proceeding pro se and

24 in forma pauperis with a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF

25 No. 1.)  Petitioner was convicted by a San Diego County Superior Court jury of one count of

26 possession of cocaine base, and two counts of possession of cocaine base for sale.  (Lodgment

27 No. 1, Clerk's Tr. ["CT"] at 198-200.)  He was sentenced to fifteen years and eight months in

28 state prison; the sentence was enhanced as a result of findings that Petitioner committed two of

the offenses while released from custody on bail, had suffered a prior drug conviction, and had a prior felony conviction which constituted a strike under California's Three Strikes law. (CT 201-06.)  Petitioner alleges here, as he did in state court, that his federal constitutional rights were violated because: (1) the trial judge improperly denied a pre-trial motion to sever the charges; (2) the trial judge erred in denying a post-trial motion for disclosure of juror contact information; and (3) the prosecutor's use of a peremptory challenge to remove one of only two African-American prospective jurors was discriminatory under Batson v. Kentucky, 476 U.S. 79 (1986).  (Pet. at 8-25.[1])

Respondent has filed an Answer to the Petition ("Ans.), along with a Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record. (ECF Nos. 12-13.)  Respondent contends that habeas relief is not available with respect to the first two claims because there is no clearly established federal law applicable to them, and therefore the state court adjudication of those claims could not be contrary to, or involve an unreasonable application of, clearly established federal law. (Ans. Mem. at 9-21.)  Respondent argues that the state court's denial of the Batson claim is objectively reasonable. (Id.)  Petitioner did not file a Traverse.

For the following reasons, the Court finds that the state court adjudication of Petitioner's claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court also finds that any federal constitutional errors are harmless with respect to Claims 1 and 2.  Accordingly, the Court **RECOMMENDS** the Petition be **DENIED**.

## II.

## STATE PROCEEDINGS

In a three-count Amended Consolidated Information filed in the San Diego County Superior Court on April 20, 2010, Petitioner was charged with two counts of possession of cocaine base for sale in violation of California Health and Safety Code section 11351.5 (counts

---

[1]  When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition and Answer, the Court will refer to the pages assigned by that system.

1 and 3), and one count of possession of cocaine base in violation of California Health and Safety Code section 11350(a) (count 2). (CT 16-19.) The Information included sentence enhancement allegations that Petitioner had been convicted of four felonies, one of which was a strike within the meaning of California's Three Strikes law, and that he committed the offenses alleged in counts 2 and 3 while released on bail. (CT 18-19.)

On May 10, 2010, the jury found Petitioner guilty on all counts. (CT 198-200.) Petitioner waived his right to a jury trial on the sentence enhancement allegations, and the trial judge made true findings with respect to all of the allegations. (Lodgment No. 3, Reporter's Tr. ["RT"] at 680-85, 700-09.) On July 23, 2012, the trial court denied a defense motion for release of juror information and a defense motion to strike the prior strike conviction, and imposed a sentence of fifteen years and eight months in state prison. (CT 205-06.)

Petitioner appealed his conviction, and raised the same claims presented here. (Lodgment No. 4.) On July 3, 2012, the appellate court affirmed in an unpublished opinion. (Lodgment No. 6, People v. Williams, No. D058734 (Cal.App.Ct. July 3, 2012).) On August 7, 2012, Petitioner filed a petition for review in the state supreme court raising the same claims. (Lodgment No. 7.) The state supreme court denied the petition on September 17, 2012, with an order which stated: "The petition for review is denied." (Lodgment No. 8.)

**III.**

**EVIDENCE ADDUCED AT TRIAL**

The following statement of facts is taken from the appellate court opinion affirming Petitioner's conviction on direct review. This Court gives deference to state court findings of fact and presumes them to be correct. See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

A. *The People's Case*

On September 18 at around 3:00 a.m., San Diego Police Officer Benjerwin Manansala responded to a report of vandalism. When Officer Manansala arrived, Williams was in the driver's seat of a nearby parked car, with his door open, and another man and a woman were standing behind the car. As he engaged them in conversation, Officer Manansala noticed several pieces of rock cocaine on the roof of the car. Officer Manansala's partner searched Williams incident to arrest and found in his right front pants pocket a glass crack pipe with a Brillo pad inside it and a chunk of cocaine base that weighed about 7.5 grams, a sufficient quantity for more than 70 usable doses of 0.1 gram each. Williams also possessed $260 in

cash, which included one $100 bill, seven $20 bills, and two $10 bills.  Inside the car, Officer Manansala's partner found a big clump of unused Brillo, which is typically used in the smoking of cocaine base, and a stick or club about two-and-a-half or three feet in length that Williams said he used to keep dogs away.  The other male detained at the scene possessed three crack pipes.  The female had neither drugs nor paraphernalia in her possession.

On September 23 at around 11:00 p.m., San Diego Police Officer Adam Schrom stopped Williams for running a stop sign and driving a car with tinted windows.  As Williams's female passenger was subject to a Fourth Amendment waiver, Officer Schrom and his partner searched the front compartment of the vehicle and found in the center console a glass pipe used for smoking cocaine base.  During a search incident to arrest, Officer Schrom and his partner found another crack pipe and 0.28 gram of cocaine base in the left pocket of Williams's shorts.

On December 1 at around 4:00 a.m., Officer Schrom again encountered Williams sitting in a parked car.  As he approached the car, Officer Schrom illuminated the passenger compartment with his flashlight and saw, in plain view, an open beer can in the center console and, on the dashboard, a screwdriver with 0.23 gram of cocaine base on its tip.  When Officer Schrom opened the driver's side door, he saw that Williams was holding a crack pipe, and he also observed in the door handle a plastic baggie that contained about 12 pieces of cocaine base later determined to have a total weight of 4.88 grams.  Williams also had in his possession $700 in cash, which included 34 $20 bills, three $5 bills, and five $1 bills. Williams's female passenger possessed a crack pipe and two small pieces of rock cocaine.

Detective Gary Avalos of the San Diego Police Department testified that street drug dealers carry smaller quantities of cocaine base, typically not more than a couple of grams, and sell it in units of one-tenth or two-tenths of a gram, which would sell on the street for $20 and $40, respectively.  When the prosecutor presented to Detective Avalos a hypothetical involving the seizure of almost five grams of rock cocaine under circumstances similar to those that Officer Schrom observed on December 1, Detective Avalos stated, "I know, based on my training and experience working in City Heights as a patrol officer, that . . . nobody buys that many rocks and just holds onto (them) for possession."  Detective Avalos testified that drug dealers, who are aware there is a severe penalty for getting caught with guns, sometimes carry sticks or clubs in their vehicles for protection.

Detective Avalos indicated that street drug dealers mainly carry smaller denomination bills, and possession of a large number of $20 bills shows the dealer is making numerous transactions involving $20 or $40 "buys."  However, people who buy drugs do not have a lot of money and thus do not carry a lot of money.  Detective Avalos observed that dealers, unlike users, often refuse to sign a receipt for their cash after it has been impounded because they want to "detach themselves from what they believe (are) indicia of sales."

When presented with hypotheticals that reflected the facts involved in Williams's three arrests, Detective Avalos opined that Williams possessed cocaine base for sale on September 18 and December 1, but Williams possessed cocaine base for personal use on September 23.

/ / /

B. *The Defense Case*

Arthur Fayer, a director of education and program manager at a nonprofit alcohol and drug treatment program under contract with the County of San Diego, testified someone could possess between five and seven grams of cocaine base for personal use with no intent to sell it. He indicated he once personally consumed between seven and 10 grams of cocaine base daily. However, some people might possess as little as one-tenth of a gram of cocaine base with intent to sell it.

Fayer opined that some users might buy a large amount of cocaine base after suddenly getting a large sum of money and then "put it away and use it sparingly or however they can." He indicated that with a volume discount, someone could buy 7.5 grams of cocaine base for about $300.

When defense counsel presented hypotheticals to Fayer and asked him whether he believed Williams possessed cocaine base for sale or personal use on September 18 and December 1, Fayer replied that it could "go either way."

Williams testified that he bought 7.56 grams of cocaine base in the early morning hours of September 18, and his intent was to smoke it, not sell it. He left the house with $500 and spent $225 to buy the drugs. He bought a large amount because he did not want to have to keep coming back to buy more.

Williams also testified he was with a woman in a car on September 23 and possessed 0.28 gram of cocaine base when he was stopped by the police. He had about $400 or $500 in his pocket, but that money was not confiscated because "when they charge you with possession, they don't take your money." Williams indicated he was stopped again in the early morning hours on December 1 in the company of another female, in the same area, and admitted he bought and possessed drugs with the intent to smoke some in the car to "(m)ake sure (he) had real drugs." Williams also indicated he was going to take the drugs back to his residence and "have a little party."

On cross-examination, Williams acknowledged he had been convicted of possession of cocaine base for sale in January 1993. The people who were with him on September 18, September 23, and December 1 were crack cocaine users, like himself. Williams testified he did not have to share the drugs and stated, "If I wanted to give them some, that was one thing. But when I had to, when I bought it, just break them off some." When the prosecutor asked Williams whether he had been unwilling to sign the receipt on the two occasions when his cash was impounded because he was "(p)aranoid to associate (himself) with drug proceeds," Williams responded, "No, sir," and stated he was "(p)aranoid (about) getting caught, period."

(Lodgment No. 6, <u>People v. Williams</u>, No. D058734, slip op. at 3-7.)

## IV.

## PETITIONER'S CLAIMS

Petitioner makes the following claims:

(1) Petitioner was denied his right to due process as protected by the Sixth, Fourteenth and Fifteenth Amendments of the United States Constitution by the denial of his pre-trial motion

to sever the three counts due to the spillover effect on the sole contested issue of intent to sell, with prejudice shown by the jurors' admitted improper use of the two possession for sale counts to bolster one another and support an inference of a propensity to sell cocaine.  (Pet. at 8-12.)

(2)  Petitioner was denied his rights to due process and a fair trial as protected by the Sixth and Fourteenth Amendments of the United States Constitution by the denial of his post-trial motion to disclose juror contact information after defense counsel disclosed that several jurors made post-verdict remarks indicating they used evidence from count 1 to convict on count 3, that one juror said it would have been difficult to find Petitioner guilty if the charges had been tried separately, and one juror stated she felt pressure from other jurors to use evidence on count 1 to convict on count 3.  (Pet. at 13-19.)

(3)  The prosecutor's discriminatory use of a peremptory challenge to remove one of only two prospective African-American jurors denied Petitioner his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  (Pet. at 20-24.)

## V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief because the adjudication of his claims by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court also finds any federal constitutional error with respect to Claims 1 and 2 to be harmless.  The Court **RECOMMENDS** the Petition be **DENIED**.

### A.    Standard of Review

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court, as each of Petitioner's claims presented here were, that in order to obtain federal habeas relief he must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if Petitioner can satisfy § 2254(d), or demonstrate that it does not apply, he still must demonstrate that a federal constitutional violation occurred. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc). Petitioner must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most constitutional errors can be harmless."); see Turner v. Marshall, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997) (holding that "[t]here is no harmless error analysis with respect to Batson claims."), overruled on other grounds, Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (en banc); Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (granting habeas relief without conducting harmless error analysis).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, __, 131 S.Ct. 770, 787 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ."  Williams, 529 U.S. at 412.  In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 131 S.Ct. at 786-87.  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents."  Id. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.    Claim 2**[2]

Petitioner contends in Claim 2 that he was denied his federal constitutional rights to due process and a fair trial by the denial of his motion for disclosure of juror contact information. (Pet. at 13-19.)  He contends defense counsel needed to contact the jurors in order to obtain their affidavits, not necessarily to directly challenge their verdicts, but to support arguments made before, during and after trial that joinder of the charges was prejudicial.  (Id.)

Respondent answers that to the extent Petitioner alleges only an error of state law, the claim does not present a federal question.  (Ans. Mem. at 13.)  Respondent contends that to the extent Petitioner presents a federal claim, he has not identified, and Respondent is not aware of, any clearly established federal law regarding the right to disclosure of juror contact information, and therefore Petitioner is unable to demonstrate that the state appellate court's denial of the

/ / /

---

[2] The Court will address Claim 2 first because its discussion informs the resolution of Claim 1.

1  claim involved an objectively unreasonable application of clearly established federal law within

2  the meaning of 28 U.S.C. § 2254(d)(1).  (Id. at 11-12.)

3      Petitioner presented each of the claims raised here to the California Supreme Court in his

4  petition for review, and to the state appellate court on direct appeal.  (Lodgment Nos. 4 and 7.)

5  The state appellate court denied the claims on the merits in a reasoned opinion, and the state

6  supreme court summarily denied the petition for review without a statement of reasoning or

7  citation of authority.  (Lodgment Nos. 6, 8.)   The Court applies the following rebuttable

8  presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later

9  unexplained orders upholding that judgment or rejecting the same claim rest upon the same

10  ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).  The Court will look through the

11  silent denial of Claim 2 by the state supreme court and apply 28 U.S.C. § 2254(d) to the

12  appellate court opinion, which stated:

13          Williams also contends the court erred "on multiple levels" when it denied
14  his motion under Code of Civil Procedure section 237 for disclosure of juror
    contact information that his counsel intended to use to obtain affidavits for a new
15  trial motion.  The motion would have been based on the claim that some of the
    jurors made postverdict remarks to defense counsel, indicating Williams was
16  denied a fair trial as a result of the court's denial of his motion for severance of the
    three joined charges in this case.  Williams maintains the court improperly held
17  him to an obsolete standard of diligence under People v. Rhodes (1989) 212
    Cal.App.3d 541 (Rhodes), which was decided three years before Code of Civil
18  Procedure section 237 (the statute that currently governs disclosure of juror
    contact information) was enacted in 1992 and held that a convicted defendant's
19  counsel was entitled to such information if the disclosure motion was
    accompanied by "a sufficient showing to support a reasonable belief that . . .
20  diligent efforts were made to contact the jurors through other means. . . ."
    (Rhodes, at pp. 551–552.)  Williams faults the court's reliance on Rhodes because
21  the Rhodes language requiring diligence in contacting jurors through other means
    "reflects procedures under old law, whereby it was considered less intrusive for
22  attorneys to let jurors go home (and) then contact them later."  He asserts "(t)here
    is no doubt this is absolutely forbidden and a misdemeanor now."

23          Williams also maintains the court interpreted Code of Civil Procedure
24  section 206, subdivision (g)—which authorizes a defense postverdict petition for
    access to juror contact information under section 237 of that code "for the purpose
25  of developing a motion for new trial or any other lawful purpose"—in an overly
    restrictive manner to mean that such information could be disclosed only for the
26  purpose of investigating a potential claim of juror misconduct.

27          Williams seeks either reversal of the judgment entirely, or, in the
    alternative, reversal and remand to the trial court for a hearing reflecting current
28  law and a determination "whether a proper 'other' purpose for disclosure (outside

the ambit of Evidence Code section 1150 (FN5) existed in (this) case." We conclude Williams's claim that the court erred in denying his motion is unavailing.

> FN5. Evidence Code section 1150, subdivision (a) (hereafter Evidence Code section 1150(a)) "bars admitting evidence showing the effect of statements or events on the mental processes of a juror, but does permit admitting 'any otherwise admissible evidence' to show that statements were made or events occurred." (*People v. Jones* (1998) 17 Cal.4th 279, 316.)

A. *Background*

1. *Williams's motion*

On May 11, 2010, the day after the jury returned its verdicts, defense counsel brought an oral motion for release of sealed juror contact information for the purpose of obtaining affidavits for a new trial motion based on the denial of Williams's severance motion and postverdict comments some of the jurors made to him questioning why he did not try to separate the three counts. The prosecutor opposed the motion, acknowledging "it would have been tougher to convict on all three counts if they were tried separately," but stating he "completely disagree(d)" with defense counsel's interpretation of what the jurors said. The prosecutor added that the jurors "absolutely did not assert that (Williams) would not be guilty had we tried (the three counts) separately." The court set the matter for hearing on July 23, 2010, the date also set for sentencing.

Williams thereafter filed his written noticed motion under Code of Civil Procedure section 237, subdivision (b) for release of the sealed juror contact information. Williams renewed his argument that he needed the juror contact information to "develop issues in support of a motion for new trial." Williams asserted that, as he had argued in his in limine severance motion, "the jury did use evidence in one count"—count 3—such as "drugs, money, pipes, (B)rillo, push rods, and early morning hours in East San Diego, to infer criminal disposition and find him guilty on the other count"—count 1. Furthermore, he argued, the postverdict juror statements to his counsel "support(ed) the good cause needed to warrant the release of juror information" because the statements "indicate(d) that the jury did not reach the factual finding that (Williams) was guilty beyond a reasonable doubt on count (1) but rather was guilty based on the cumulative impermissible use of evidence and was contrary to the law."

In support of his motion, Williams attached the declaration of his trial counsel, who stated in part:

> "5. After the verdict several of the jurors stayed to discuss the case with counsel outside the courtroom.

> "6. I asked the jurors if the jury had made a separate finding of fact as to whether (Williams) was guilty on count (1) and count (3), possession of controlled substance for sale.

> "(7). Several of the jurors ( ) said they used evidence of count (3) to convict my client on count (1). One of the jurors stated they would have had a very difficult if not impossible task of find(ing) (Williams) guilty if the charges were tried separately. Another juror

questioned why I did not request the charges on separate days be tried separ(a)tely.

"(8). Another juror stated she felt pressure from other jurors based on impermissible use of evidence on count (3) to infer (Williams) had a character disposition to commit count (1) and therefore was probabl(y) guilty."

2. *The People's opposition*

The prosecution filed written opposition arguing that Williams's motion and supporting affidavit failed to make a prima facie showing of good cause for the release of the information as required by Code of Civil Procedure section 237, subdivision (b), because the requisite good cause, as defined in *Rhodes*, *supra*, 212 Cal.App.3d at p. 552, requires a "sufficient showing to support a reasonable belief that *jury misconduct* occurred." (Italics added.) Here, the prosecution argued, Williams's claim of good cause "impermissibly relie(d) solely on information of several jurors' mental process(es) in reaching their verdicts" in violation of Evidence Code section 1150(a). The prosecution added:

"How a particular juror used any piece of evidence to reach his or her own ultimate decision of guilt on any count or what potential pressure any juror may have felt in coming to his or her ultimate decision is not for a court to review. ( ) Evidence Code (s)ection 1150(a) expressly prohibits inquiry into a juror's mental process. (Williams) makes no outward allegation of *juror misconduct* but instead bases his 'good cause' claim on the perceived mental process(es) of several jurors. Defense has failed to make a sufficient showing to support a reasonable belief that *jury misconduct* occurred." (Italics added.)

3. *Hearing and ruling*

On July 23, 2010, during the hearing on Williams's motion, the prosecutor indicated he was privy to the postverdict juror statements on which Williams was relying, but his recollection of the substance of those statements differed:

"Your Honor, . . . about the only thing I agree with the characterizations that (defense counsel) is making is the fact that one of the jurors did in fact ask him why he didn't try the counts separately. What they said at that point was simply the case would have been *more difficult* had each count been tried separately; *they did consider all of the evidence in making their decision*." (Italics added.)

The prosecutor added that "even if the Court believe(d) everything" defense counsel was saying, defense counsel still had failed to show good cause.

Defense counsel agreed with the prosecutor that the jurors had stated it would have been more difficult for them to reach a guilty verdict on count 1 if they had not heard the evidence regarding count 3, and he repeated his recollection that they asked him, "Why didn't . . . you do your job and separate the charges and try them separately?"

The court asked defense counsel, "Well, they didn't give any indication, though, that they hadn't applied the proof beyond a reasonable doubt standard, did

they?" Defense counsel replied, "Well, I . . . didn't query any further." He then told the court:

> "If I get a statement out of them that . . . Count 1 wouldn't have been proved beyond a reasonable doubt, or they seriously would have questioned that had Count 3 not been there, I think that's an affidavit that if I can bring to the Court—"

The court then interjected the comment, "Well, but, how does that get you around the language of (section) 1150(a) of the Evidence Code? I think, at most, that brings it squarely within the provisions of (Evidence Code section) 1150(a). That's exactly why we have that privilege, I think."

Following additional argument, and applying the *Rhodes* test for "good cause," FN6 the court told defense counsel, "I don't think in what you've presented . . . (that) there's a basis for m(y) having a *reasonable belief that jury misconduct occurred*." (Italics added.) The court indicated that if it accepted the prosecutor's recollection of what the jurors said, there would be no basis for having a reasonable belief that jury misconduct occurred because "(t)hey emphasized that they ha(d) considered (counts 1 and 3) separately and they have applied the proof beyond a reasonable doubt standard."

> FN6. *Rhodes* held that, "upon timely motion, counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a *sufficient showing to support a reasonable belief that jury misconduct occurred*, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*Rhodes, supra*, 212 Cal.App.3d at p. 552, italics added.) We refer to the portion of the holding in *Rhodes* requiring the defendant to set forth a "sufficient showing to support a reasonable belief that jury misconduct occurred" as the *Rhodes* test for "good cause."

Defense counsel responded, "I didn't hear them make that statement. What I heard was they had difficulty with Count 1 and Count 3 and questioned my integrity (for) having them tried together." The following exchange then took place between the court and defense counsel, at the end of which the court denied Williams's motion on the ground he had failed to establish good cause under the *Rhodes* test:

> "(THE COURT): *The fact they had difficulty with (counts 1 and 3)* —we expect jurors to have difficulty with cases. I mean, by definition, I hope the cases that go to trial where we spend several days trying it to a jury are cases that are going to present some difficulty to the jurors. If it's a slam dunk case, then we shouldn't be here. So that *doesn't show any juror misconduct.*

> "(DEFENSE COUNSEL): Difficulty in finding guilt on Count 1 until they were able to accumulate the evidence on Count 3, is what they said. By using that evidence, they were—

> "(THE COURT): *The jury instructions make it clear they have to consider each count separately; have to reach a separate verdict as to each count.*

13cv2070

"(DEFENSE COUNSEL): And *that's the violation that we're counting on*, Your Honor, is that *they didn't do that.*

"(THE COURT): I don't see—*I don't have any reasonable suspicion that that was violated, so the motion is denied*." (Italics added.)

B. *Applicable Legal Principles*

After the recording of a jury verdict in a criminal case, the court's record of personal juror identification information (names, addresses, and telephone numbers) is sealed. (Code Civ. Proc., § 237, subd. (a)(2).)  On a petition filed by a defendant or his or her counsel, a trial court may in its discretion grant access to such information when necessary to the development of a motion for new trial or "any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).)

A petition for access to personal juror identification information must be supported by a declaration citing facts "sufficient to establish good cause" for the release of the information.  (Code Civ. Proc., § 237, subd. (b).)  If the petition and declaration establish a prima facie showing of good cause, the trial court must set the matter for hearing.  (*Ibid.*)  If the matter is set for hearing, the petitioner must provide notice "to the parties in the criminal action" and the court must provide notice to each juror whose personal identification information is sought.  (*Id.*, subd. (c).)  An affected juror may appear at the hearing to oppose release of the information.  (*Ibid.*)  If the court determines not to set the matter for hearing, it is required to set forth the reasons and make an express finding either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure.  (Code Civ. Proc., § 237, subd. (b).)

In an uncodified declaration made as part of the 1995 amendment of Code of Civil Procedure section 206, the Legislature stated that jurors who have served on a criminal case have completed their civic duty.  The Legislature also stated the procedures in Code of Civil Procedure sections 206 and 237 were designed "to balance the interests of providing access to records of juror identifying information for a particular, identifiable purpose against the interests in protecting the jurors' privacy, safety, and well-being, as well as the interest in maintaining public confidence and willingness to participate in the jury system." (Stats.1995, ch. 964, § 1, p. 7375.)  The courts have long recognized their inherent power to strike this balance. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091–1096; *Rhodes*, *supra*, 212 Cal.App.3d at pp. 548–552.)

In this context, to demonstrate the statutorily required good cause, a defendant must make a sufficient showing under the *Rhodes* test (see fn. 6, *ante*) "to support a reasonable belief that jury misconduct occurred." (*Rhodes, supra*, 212 Cal.App.3d at p. 552.)  "Even though *Rhodes* was decided before the . . . present enactment (of section 237) requiring a showing of good cause, the *Rhodes* test survived" the enactment. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990; see also *People v. Wilson* (1996) 43 Cal.App.4th 839, 852 (affirming trial court's denial of defense counsel's request for personal juror identification information because "no showing whatsoever was made o(f) any type of juror misconduct").)

The alleged juror misconduct must be "'of such a character as is likely to have influenced the verdict improperly.'" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322, quoting Evid.Code, § 1150(a).)  Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague or unsupported.

(*People v. Wilson, supra*, 43 Cal.App.4th at p. 852; *Rhodes, supra*, 212 Cal.App.3d at pp. 553–554.)  Furthermore, a trial court may properly consider whether the evidence offered in support of the petition would be excludable under Evidence Code section 1150(a) on the ground it reveals the mental processes by which jurors reached the verdict.  (See *People v. Jones, supra*, 17 Cal.4th at pp. 316–317; *Rhodes*, at pp. 553–554.)

A trial court's denial of a petition for access to juror identification information is reviewed for abuse of discretion.  (*People v. Jones, supra*, 17 Cal.4th at p. 317.)

C. *Analysis*

We conclude the court did not abuse its discretion in denying Williams's motion for release of the sealed juror contact information because his motion and the supporting declaration of his trial counsel failed to cite facts "sufficient to establish good cause" for the release of the information as required by Code of Civil Procedure section 237, subdivision (b).  As already discussed, to establish the requisite good cause under the applicable *Rhodes* test, Williams had the burden of setting forth "a sufficient showing to support a reasonable belief that jury misconduct occurred."  (*Rhodes, supra*, 212 Cal.App.3d at p. 552; see also *People v. Carrasco, supra*, 163 Cal.App.4th at p. 990; *People v. Wilson, supra*, 43 Cal.App.4th at p. 852.)

Williams failed to meet that burden, as the court correctly found.  In his written motion, Williams claimed that postverdict statements by some of the jurors provided good cause for release of the sealed juror contact information for the purpose of obtaining affidavits for a new trial motion based on the court's denial of his in limine severance motion because the statements indicated the jury "did not reach the factual finding that (he) was guilty beyond a reasonable doubt" on count (1,) but rather was guilty based on the cumulative impermissible use of evidence"; and, thus, the verdict was contrary to the law and grounds for a new trial under Penal Code section 1181.  During the hearing, Williams's counsel clearly suggested the jury committed misconduct by violating the court's instructions requiring it to consider each count separately and reach a separate verdict as to each count.

Where a party seeks a new trial based upon jury misconduct, the court first must determine whether the evidence presented for its consideration is admissible.  (*People v. Duran* (1996) 50 Cal.App.4th 103, 112 (*Duran*).)

Here, the evidence presented for the court's consideration was set forth in the declaration of Williams's trial counsel, who stated that he asked some of the former jurors whether "the jury had made a separate finding of fact as to whether [Williams] was guilty on count (1) and count (3)," the two counts charging him with possession of cocaine base for sale.  Counsel also stated in his declaration that several of the jurors "said they used evidence of count (3) to convict (Williams) on count (1)"; one of the jurors stated he or she "would have had a very difficult if not impossible task of find(ing) (Williams) guilty if the charges were tried separately"; and another juror "felt pressure from other jurors based on impermissible use of evidence on count (3) to infer (Williams) had a character disposition to commit count (1) and therefore was probabl(y) guilty."

Assuming the former jurors would have submitted affidavits consistent with defense counsel's representations about the contested postverdict statements some of them allegedly made, such evidence would have been inadmissible under

-14-

13cv2070

Evidence Code section 1150(a), and thus insufficient to support a reasonable belief that jury misconduct occurred.  Evidence Code section 1150(a) provides:

> "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined*." (Italics added.)

Our courts have held that Evidence Code section 1150(a) permits jurors to testify to "'overt acts,'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration.'"  (*In re Stankewitz* (1985) 40 Cal.3d 391, 398; *Duran, supra*, 50 Cal.App.4th at p. 112.)

Here, Williams's claim of good cause for release of the juror contact information impermissibly rests on evidence reflecting on the mental processes of several former jurors in reaching their verdicts.  Evidence that a former juror made a postverdict statement that he or she used evidence of one count to convict the defendant of another count, or would have had a "a very difficult if not impossible task" of reaching a guilty verdict if "the charges were tried separately," as averred in paragraph 6 of the second page of Williams's counsel's declaration, is not evidence of an overt act that would be subject to corroboration.  (See *In re Stankewitz, supra*, 40 Cal.3d at p. 398.)  Rather, it is evidence that impermissibly reflects on the juror's mental processes in reaching a verdict.  (See Evid.Code, § 1150(a).)  The same is true of evidence that a former juror subjectively "felt pressure" from other jurors or used certain evidence to infer the defendant had a certain character disposition and, thus, was probably guilty," as averred in paragraph 8 of Williams's counsel's declaration.

To the extent Williams seeks to use the evidence of postverdict statements made by some of the jurors to indirectly challenge the court's denial of his motion in limine to sever the three counts, we have already concluded the court did not err in making that ruling.

In light of our conclusion that Williams has failed to meet his burden of establishing good cause for release of the juror contact information as required by Code of Civil Procedure section 237, subdivision (b), we need not reach the merits of his additional claim that the court improperly held him to an obsolete standard of diligence under *Rhodes, supra*, 212 Cal.App.3d 541.

(Lodgment No. 6, <u>People v. Williams</u>, No. D058734, slip op. at 18-29.)

"The general [federal] rule is that affidavits of jurors will not be received for purposes of impeaching their verdict."  <u>Bateman v. Donovan</u>, 131 F.2d 759, 764 (9th Cir. 1942), citing <u>McDonald v. Pless</u>, 238 U.S. 264, 267-68 (1915) ("The rule is based upon controlling consideration of a public policy which in these cases chooses the lesser of two evils. . . . the court must choose between redressing the injury of the private litigant and inflicting the public

-15-

13cv2070

injury which would result if jurors were permitted to testify as to what had happened in the jury room.")  An exception to that rule has been recognized for the introduction of extraneous evidence or influence into the jury room.  Harrison v. Gillespie, 640 F.3d 888, 895 n.4 (9th Cir. 2011) ("We mention the juror's dueling affidavits only to explain the full context and procedural history of the case.  We may not consider the jurors' testimony addressing the jury's deliberative process unless the testimony 'bear(s) on extraneous influences on the deliberation."), quoting United States v. Pimentel, 654 F.2d 538, 542 (9th Cir. 1981) ("Testimony of a juror concerning the motives of individual jurors and conduct during deliberation is not admissible.  Juror testimony is admissible only concerning facts bearing on extraneous influences on the deliberation, in the sense of overt acts of jury tampering."), citing Mattox v. United States, 146 U.S. 140, 148-49 (1892).  The Supreme Court recently held that Federal Rule of Evidence 606(b), which provides that juror testimony regarding what occurs in a jury room is inadmissible during "an inquiry into the validity of a verdict," precludes the use of a juror's affidavit of what another juror said during deliberations to demonstrate the juror's dishonesty during voir dire. Warger v. Shauers, 574 U.S. ___, No. 13-517 (Dec. 9, 2014) (noting that Rule 606(b) reflected Congress' decision to adopt the federal common law approach, which "prohibited the use of *any* evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences.")

Respondent correctly observes that because the United States Supreme Court has yet to determine whether a state court rule limiting post-verdict contact with jurors, or prohibiting admission of juror testimony regarding their deliberations to challenge their verdict, can rise to the level of a federal constitutional violation, there is no "clearly established federal law" within the meaning of § 2254(d)(1) with respect to Claim 2.  See Woodall, 134 S.Ct. at 1706 (holding that "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not 'clearly established at the time of the state-court decision.'"), quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004).  The Supreme Court has stated that § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." Woodall, 134 S.Ct. at 1706, quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007).  Rather,

"relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Woodall, 134 S.Ct. at 1706-07, quoting Richter, 131 S.Ct. at 787. However, even assuming the rulings addressed above constituted clearly established federal law, that federal law would be that excluding testimony from jurors regarding their deliberations does not violate due process, at least, as here, where there has been no showing that extrinsic matters were introduced into the deliberations. Therefore, even if there were clearly established federal law in this area, the state appellate court's determination that Petitioner did not demonstrate good cause for release of the juror information (on the basis that inquiring of the jurors would not produce evidence admissible to challenge their verdicts), is neither contrary to, nor involved an unreasonable application of, such a federal rule. See Woodall, 134 S.Ct. at 1705 (holding that state courts have broad discretion where the precise contours of the right remains unclear).

It does not appear that § 2254(d)(2) applies to this claim because Petitioner's challenge is to the legal conclusion reached by the state court, and not the factual basis of that conclusion, and as such is appropriately considered by this Court under § 2254(d)(1). See e.g. Lopez v. Smith, 574 U.S. __, 2014 WL 4956764 at *4 (Oct. 6, 2014) (holding that a finding of inadequate notice under § 2254(d)(2) was in reality a challenge under § 2254(d)(1) to the "legal conclusion about the adequacy of the notice provided.") However, it is clear that a review of the state appellate court opinion above reveals that the adjudication of this claim is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, because Petitioner has not demonstrated that the state court factual findings are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. at 340. To the extent Petitioner argues that the state court erred in failing to develop the record by refusing his request to obtain juror affidavits because the affidavits would not be used to directly challenge the verdicts but as support for a finding of prejudice arising from the denial of the severance motion (see Pet. at 19), that argument is discussed and rejected below with respect to Claim 1.

/ / /

It is clear that any error in denying the motion for disclosure of the juror information would be harmless because: (1) the juror's statements would not be admissible to challenge their verdicts; and (2) even if they were admissible with respect to Petitioner's claim that his federal due process rights were violated by the joinder of the counts, for the reasons discussed below with respect to Claim 1, Petitioner has not established a due process violation with respect to joinder.

Accordingly, the Court finds that the state court adjudication of Claim 2 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. Alternately, assuming Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d)(1) or (d)(2), the Court finds that any federal constitutional violation was harmless. Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 2.

## C.    Claim 1

Petitioner alleges in Claim 1 that his federal constitutional right to due process was violated by the denial of a pre-trial defense motion to have separate trials on the separate counts. (Pet. at 8-12.) He contends the error cannot be deemed harmless for the same reason prejudice has been shown, because several jurors admitted to using the two possession for sale counts (counts 1 and 3) to bolster each other and to draw an impermissible inference that he had a bad character and a propensity to sell cocaine base. (Id.) He contends the cross-over effect of counts 1 and 3 was exacerbated by his admission during his trial testimony that he had previously been convicted of possession of cocaine base for sale, and points to post-verdict juror statements that some of the jurors believed the counts should have been severed and that some jurors believed the counts, as a group, showed a disposition for drug sales. (Id.)

Respondent answers that to the extent the alleged error in denying the severance motion is based on an error of state law only, the claim does not present a federal question. (Ans. Mem. at 11.) Respondent contends that to the extent the claim presents a federal question, Petitioner has not identified, and Respondent is unaware of, any clearly established federal law which provides a federal due process violation can arise from a state court's failure to sever charges,

and therefore the state appellate court's denial of the claim could not possibly involve an objectively unreasonable application of clearly established federal law within the meaning of § 2254(d)(1).  (Id. at 11-12.)  Respondent does not discuss the applicability of § 2254(d)(2) to this or any claim presented, other than to generally contend that Petitioner has not rebutted the presumption of correctness applicable to the state court findings of fact.  (Ans. at 2.)

The Court will look through the silent denial of Claim 2 by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Williams claims the judgment must be reversed because the court's denial of his motion in limine to sever the three joined counts resulted in gross unfairness that had the effect of denying him a fair trial.  In support of this claim, he asserts the jury used the two possession-for-sale counts "to bolster each other" and to draw an "illegitimate inference" that he "had a bad character, and a propensity to sell cocaine base."  He also maintains that joinder, combined with his acknowledgment on cross-examination that he was convicted in 1993 of possession for sale of cocaine base (Health & Saf.Code, § 11351.5), created a "spill-over effect" with the result that he was "grossly prejudiced by having one sales count spill over to the other."  Williams also relies on his trial counsel's postverdict report to the court that "jurors (took counsel) to task for not doing his job and getting separate trials, saying the various instances showed a 'character' or 'disposition' for drug sales."  FN 2  Williams's claim is unavailing.

> FN 2:  Defense counsel's postverdict oral report to the court on May 11, 2010, about what he claimed some of the jurors said to him in the hallway after they were excused was the basis for Williams's unsuccessful request for disclosure of juror contact information, which is one of the subjects (discussed, *post*) of the instant appeal.

> A. *Background*

> The amended consolidated information charged Williams with the commission of three drug offenses in late 2009.  Count 1 charged him with possession—on September 18—of cocaine base for sale.  Count 2 charged him with simple possession of cocaine base on September 23.  Count 3 charged him with possession of cocaine base for sale on December 1.

> 1. *Williams's motion and the parties' arguments*

> The defense thereafter filed a motion in limine opposing consolidation of the three charges and seeking separate trials on each of the three counts.  In his motion, Williams argued the charges should not be jointly tried because the alleged offenses occurred on three separate dates during a two-and-a-half-month period, each offense was separate and distinct and involved different witnesses, and the evidence was not cross-admissible because the evidence pertaining to each incident was inadmissible in the trials of the charges based on the other incidents.  Williams also claimed a joint trial would prejudice his federal constitutional rights to a fair trial and to remain silent because in the event he chose to testify on his own behalf as to one count but not the others, the jury might impermissibly infer he was guilty of the counts as to which he chose to remain silent, and thus he would "be coerced into testifying" as to all three counts and "effectively lose his

right to remain silent." In addition, Williams claimed, if the three charged offenses were joined, the jury might impermissibly use the evidence relating to one offense to infer that he had a criminal disposition to commit the others, and the jury also might "cumulate the evidence of the various crimes charged and find guilt, when if considered separately, it would not so find."

In support of joinder of the three charged offenses, the prosecution argued that section 954 (discussed, *post*) expresses a legislative preference for joint trials of similar offenses charged against a single defendant, and the court should deny the defense request to sever the counts because the charged offenses were of the same class in that all three counts involved "either the possession for sale or simple possession of cocaine base," they were connected by cross-admissible evidence, and Williams could not show prejudice that would justify severance.

### 2. *Ruling*

The court denied Williams's severance motion. The court reasoned that "the counts are properly joined because they're similar crimes and . . . there's not a great period of time involved here," the prosecution was not "bootstrapping" a weak charge by mixing it with a strong charge, and thus there was no spillover effect because there was "no obvious great disparity in terms of the strength of the evidence between these three counts." Referring to the possession for sale counts, the court stated that the main thrust of the defense appeared to be that Williams knowingly possessed the cocaine base, but did so for his personal use, not for sale. Noting that "the cases make it clear that the law strongly favors consolidation," the court found the defense had not carried its burden of showing a "substantial danger of undue or unfair prejudice or denial of a fair trial by trying these three charges together."

### B. *Applicable Legal Principles*

The law prefers consolidation (or joinder) of related charged offenses for trial because joinder, "'whether in a single accusatory pleading or by consolidation of several accusatory pleadings, ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials (citation), and in several respects separate trials would result in the same factual issues being presented in both trials.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 409; see also *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*) ("(B)ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law.").)

Section 954 provides that "(a)n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately. . . ." Offenses committed at different times and places are "connected together in their commission" within the meaning of section 954 when there is a common element of substantial importance among them. (*People v. Matson* (1974) 13 Cal.3d 35, 39.)

If the statutory requirements under section 954 for joinder of charged offenses are met, a defendant claiming the trial court erred by denying his motion

to sever the joined charges has the burden to clearly establish that joinder poses a substantial danger of prejudice. (*People v. Soper* (2009) 45 Cal.4th 759, 773 (*Soper*).) A defendant seeking severance of properly joined charges "'"must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial."'" (*Id.* at p. 774, quoting *Alcala*, *supra*, 43 Cal.4th at p. 1222, fn. 11.)

In determining whether a trial court abused its discretion in declining to sever properly joined charges, "'we consider the record before the trial court when it made its ruling.' (Citation.) Although our assessment 'is necessarily dependent on the particular circumstances of each individual case, . . . certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.'" (*Soper*, *supra*, 45 Cal.4th at p. 774.)

"First, we consider the cross-admissibility of the evidence in hypothetical separate trials." (*Soper*, *supra*, 45 Cal.4th at p. 774.) If evidence underlying the properly joined charges in question would be cross-admissible under Evidence Code section 1101, FN3 "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Soper*, at pp. 774–775; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315–1316 (first step in assessing whether a combined trial would have been prejudicial "'is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.'").)

FN3. Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Subdivision (b) of that section "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, at p. 393, fn. omitted.) Specifically, Evidence Code section 1101, subdivision (b) provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

However, "complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.'" (*Alcala*, *supra*, 43 Cal.4th at p. 1221.) "Moreover, even if the evidence underlying these charges would not be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 775; see also *Alcala*, at p. 1221 ("Our decisions ... make clear that even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance. We repeatedly have found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion even when the evidence underlying the charges would not have been cross-admissible in separate trials.").)

If we determine that evidence underlying properly joined charges would not be cross-admissible, we then consider whether the benefits of joinder were sufficiently substantial to outweigh the possible spillover effect of the other-crimes evidence on the jury in its consideration of the evidence of defendant's guilt of each of the joined charges.  (*Soper*, *supra*, 45 Cal.4th at p. 775.)  "In making that assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. (Citations.)  We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state."  (*Ibid.*, fn. omitted.)

### 1. *Standard of review*

The denial of a motion to sever charged offenses which are properly joined under section 954 is reviewed for abuse of discretion, and the ruling will be reversed only if the court has abused its discretion.  (*People v. Osband* (1996) 13 Cal.4th 622, 666.)  Such an abuse of discretion may be found when the court's ruling "'falls outside the bounds of reason.'"  (*Ibid.*)

### C. *Analysis*

We conclude Williams has not met his burden of establishing that the court abused its discretion or violated his federal constitutional right to a fair trial by denying his severance motion.  Williams does not challenge the Attorney General's showing that the three counts in question were properly joined because both simple possession of cocaine base and possession of cocaine base for sale are crimes of the same class within the meaning of section 954.

Regarding the cross-admissibility factor, we conclude that evidence underlying both count 1—based on the September 18 incident—and count 3—pertaining to the December 1 incident—would be cross-admissible under Evidence Code section 1101, subdivision (b) (see fn. 3, *ante*) in hypothetical separate trials with respect to the issue of whether Williams possessed the cocaine base with intent to sell it.  (See *People v. Ewoldt, supra*, 7 Cal.4th at p. 402 ("The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.").)  The evidence underlying both counts 1 and 3 would also be cross-admissible in a hypothetical separate trial on the count 2 simple possession charge to establish Williams's knowledge that the substance he possessed on September 23 was cocaine base.  (See Evid.Code, § 1101, subd. (b).)  Although evidence underlying the simple possession charge would not be cross-admissible in hypothetical separate trials on counts 1 and 3 with respect to the issue of whether Williams possessed the cocaine base with intent to sell it, "that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever (the) properly joined charges."  (*Soper*, *supra*, 45 Cal.4th at p. 775; see also *Alcala, supra*, 43 Cal.4th at p. 1221 ("complete (or so-called two-way) cross-admissibility is not required").)

Having considered the cross-admissibility factor, we next consider the three remaining factors (discussed, *ante*) recognized by the courts to be relevant to an assessment of whether the benefits of joinder of the charged offenses were sufficiently substantial to outweigh the possible spillover effect of the other crimes

evidence on the jury in its consideration of the evidence of a defendant's guilt of each of the joined charges. (*Soper*, *supra*, 45 Cal.4th at p. 775.) First, although possession of cocaine base for sale is a more serious offense than simple possession of cocaine base, it is not a crime particularly likely to inflame the jury against Williams.

Second, nothing in the trial record itself indicates that a weak case was joined with a strong case or another weak case so that the totality of the evidence altered the outcome as to some or all of the charges. We are cognizant of Williams's claim that prejudice is demonstrated by "the jury's own remarks after the verdict, indicat(ing) they found it easier to convict with multiple sales charges, and . . . criticiz(ing) defense counsel for allowing a joint trial." However, we conclude the court's charge to the jury dispelled any potential substantial prejudice in this case. The court instructed the jury under CALCRIM No. 2302 on the elements of possession for sale of a controlled substance, under CALCRIM No. 2304 on the elements of simple possession of a controlled substance, and under CALCRIM No. 220 on the People's burden to "prove each element of a crime beyond a reasonable doubt." Of particular importance, the court gave CALCRIM No. 375 regarding the People's evidence that Williams committed another possession-of-cocaine-base-for-sale offense that was not charged in this case. That instruction admonished the jurors, "Do not consider this evidence for any other purpose except for the limited purpose of determining whether the defendant had the intent to sell and whether the defendant knew the substance was a controlled substance." It also admonished the jurors, " *Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime*." (Italics added.) Equally important was the court's instruction under CALCRIM No. 3515 that "(e)ach of the counts charged in this case is a separate crime . . . . *You must consider each count separately and return a separate verdict for each one*." (Italics added.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Here, in the absence of evidence that would rebut the presumption, we presume the jurors understood and followed the foregoing instructions, which clearly informed them of their duty to consider each of the three counts separately, not draw what Williams refers to as "an illegitimate inference" regarding his "'character' or 'disposition' to commit the (charged) offenses," and to find Williams not guilty of a given charge unless the People proved each element of the crime beyond a reasonable doubt. None of the statements jurors allegedly made to defense counsel is sufficient to rebut the presumption that the jurors followed the instructions given by the court. FN4

> FN4. Regarding the last of the remaining factors, it is undisputed that none of the charges involved a capital offense and joinder of the charges did not convert the matter into a capital case. (See *Soper, supra*, 45 Cal.4th at p. 775.)

Last, after balancing the potential for prejudice to Williams against the countervailing benefits to the state (see *Soper*, *supra*, 45 Cal.4th at p. 775), we conclude the benefits of joinder were sufficiently substantial to outweigh the possible spillover effect of the other crimes evidence on the jury in its consideration of the evidence of defendant's guilt of each of the joined charges. Officer Schrom, one of the prosecution's principal witnesses, was involved in both the September 23 incident and the December 1 incident. Another principal prosecution witness, San Diego Police Department Criminalist Amy McElroy, weighed and tested the drugs seized during all three incidents. The ability of key prosecution witnesses like Officer Schrom and Criminalist McElroy, and defense

witness Arthur Fayer to testify in a single trial served the state's interest in judicial efficiency and economy that substantially outweighed any potential prejudice to Williams. Accordingly, we conclude Williams's claim that the court's denial of his motion in limine to sever the three joined counts resulted in gross unfairness that had the effect of denying him a fair trial, is unavailing.

(Lodgment No. 6, <u>People v. Williams</u>, No. D058734, slip op. at 7-17.)

The Ninth Circuit has held, pre-AEDPA, that a state prisoner can establish a violation of his federal due process right to a fair trial, and obtain federal habeas relief, if the state court's denial of his severance motion rendered his trial fundamentally unfair. <u>See</u> <u>Bean v. Calderon</u>, 163 F.3d 1073, 1084 (9th Cir. 1998) ("[T]he propriety of a consolidation rests within the sound discretion of the state trial judge. The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate."), quoting <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1503 (9th Cir. 1991). Federal habeas relief would not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Bean</u>, 163 F.3d at 1086, quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

Notwithstanding the Ninth Circuit's pre-AEDPA opinions in <u>Bean</u> and <u>Featherstone</u>, Respondent contends there is no "clearly established federal law" regarding severance because the Supreme Court has yet to address the issue directly. Where AEDPA applies, as it does here, a federal habeas court must apply federal law as established by United States Supreme Court holdings. <u>Woodall</u>, 134 S.Ct. at 1702 n.2, 1706; <u>Parker v. Matthews</u>, 567 U.S. ___, 132 S.Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' . . . [and] cannot form the basis for habeas relief under AEDPA."), quoting 28 U.S.C. § 2254(d)(1). The Supreme Court has acknowledged that § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." <u>Woodall</u>, 134 S.Ct. at 1706, quoting <u>Panetti</u>, 551 U.S. at 953. Rather, "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." <u>Woodall</u>, 134 S.Ct. at 1706-07, quoting <u>Richter</u>, 131 S.Ct. at 787.

/ / /

Respondent cites <u>Collins v. Runnels</u>, 603 F.3d 1127 (9th Cir. 2010), for the proposition that the Ninth Circuit has determined there is no clearly established federal law within the meaning of 28 U.S.C. § 2254(d) with respect to severance.  (Ans. Mem. at 12.)  In <u>Collins</u>, which involved a joint trial of defendants with antagonistic defenses, not joinder of charges as here, the Ninth Circuit noted the language in <u>United States v. Lane</u>, 474 U.S. 438 (1986), which states:  "Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  <u>Lane</u>, 474 U.S. at 446 n.8.  The court in <u>Collins</u> found that statement in <u>Lane</u> to be dicta because <u>Lane</u> addressed standards of joinder under Federal Rules of Criminal Procedure 8 and 12, and did not involve a federal constitutional issue.  <u>Collins</u>, 603 F.3d at 1132.  The Ninth Circuit in <u>Collins</u> found that because the Supreme Court had not yet addressed under what conditions a failure to sever defendants could rise to the level of a federal due process violation, there was no clearly established federal law available within the meaning of 28 U.S.C. § 2254(d) as to that issue.  <u>Id.</u>

Although the Supreme Court has recognized that a fundamentally unfair state criminal trial can rise to the level of a federal due process violation, <u>see e.g.</u> <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."), <u>Collins</u> stands for the proposition that there is no clearly established federal law regarding a claim that a state criminal defendant received a fundamentally unfair trial due to the failure to sever his trial from that of a co-defendant with a mutually antagonistic defense.  There does not appear to be a valid basis to distinguish <u>Collins</u> from the present case, as it likewise does not appear that the Supreme Court has ever specifically addressed whether and to what extent a failure to sever charges can rise to the level of a federal due process violation.  Rather, as shown by <u>Collins</u>, federal criminal procedural rules control severance in federal trials (including severance of charges), and the Supreme Court has not been called upon to address whether a federal constitutional right to severance exists in federal criminal proceedings.  The Supreme Court has addressed severance of charges in a case decided before the adoption of Federal Rules of Criminal Procedure 8 and

12 in 1937, see Pointer v. United States, 151 U.S. 396, 403 (1894) (holding that federal common law provides that the trial judge "is invested with such discretion [regarding severance of charges] as enables it to do justice between the government and the accused."), but apparently has never done so in the context of a state criminal trial.  Accord Collins, 603 F.3d at 1132.  Because there can be no fairminded disagreement as to whether a federal due process right to severance of counts in a state criminal trial has been "clearly established," the Court is prohibited from finding that the state court adjudication of Claim 1 was contrary to, or involved an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1), even if Petitioner could demonstrate that the failure to sever the counts resulted in a fundamentally unfair trial.  Woodall, 134 S.Ct. at 1706-07; Collins, 603 F.3d at 1132.

The Court also finds that, assuming clearly established federal law provides that a failure to sever charges can rise to the level of a federal due process violation if joinder of charges renders a trial fundamentally unfair, Petitioner has not demonstrated that the appellate court's adjudication of his claim resulted in an objectively unreasonable application of that principle.

On the day after the verdicts were returned, defense counsel stated:

> Well, we made the original argument based on the request you sever the charges.  And the jurors in their comments, um, specifically, um – I believe it was Juror Nos. 6, 9, 12 and one other juror.  I don't know if he was sitting in seat No. 10 – that, um, had these cases been tried separately, they would have had a hard time finding him guilty, ah, on the Count 1 or Count 3; and, that their discussion was that they did aggregate all the evidence.  It was – the result was very well that the jury considered the evidence in Count 3 or Count 1 to come to the conclusions of guilty in Count 1.
>
> And I believe we made the argument that the situations where the relative strength of the cases, whether they're equal or unequal, still presents a danger in the jury aggregating that evidence.  And from what I heard from some of the jurors, in their deliberations, they did consider the evidence to an extent – maybe excess – giving it excess weight and too strongly in that regards to the one charge of Count 1 and the separate count, ah, charge of Count 3.
>
> The results, ah, I believe from what the jurors told me outside, will be that the two cases, in their minds, would have come out differently had they been tried separately; ah, and that they very well may have impermissibly used the evidence, ah, in the Count 1 or Count 3, or vice versa, in coming to the decision of guilt.

(RT 711.)

After the trial judge stated that: "I didn't hear anything that I thought constituted juror misconduct," the prosecutor replied:

> Your Honor, I just want to make sure the record is clear that I completely disagree with [defense counsel]'s interpretation of what the jury said out there. [¶] My interpretation was they indicated, yes, it would have been tougher to convict on all three counts if they were tried separately. But that doesn't – they absolutely did not assert that he would not be guilty had we tried them separately.

(RT 714.)

Defense counsel later submitted a declaration in support of a motion for release of juror contact information which stated that several of the jurors said they used evidence on count 3 to convict on count 1; one juror said "they would have had a very difficult if not impossible task of [finding Petitioner] guilty if the charges were tried separately"; another juror questioned why defense counsel did not request the charges be tried separately; and one "juror stated she felt pressure from other jurors based on impermissible use of evidence on count (3) to infer [Petitioner] had a character disposition to commit count (1) and therefore was probably guilty." (Lodgment No. 6, People v. Williams, D058734, slip op. at 20-21.) At the hearing on the motion for disclosure of juror information, the prosecutor took exception to defense counsel's declaration, stating:

> Your Honor, the only – about the only thing I agree with the characterizations that [defense counsel] is making is the fact that one of the jurors did in fact ask him why he didn't try the counts separately. What they said at that point was simply the case would have been more difficult had each count been tried separately; they did consider all of the evidence in making their decision.
>
> Now, also what went on in the hall was [defense counsel] basically cross-examining these defendants – these jurors, trying to get them on his side so that he could file some sort of a motion. [¶] What those jurors did say was that "your defendant got a very fair trial; that we took each one of those counts and we looked at them individually and then we made a decision." They assured [defense counsel] numerous times, trust me, "your guy got a very fair trial."

(RT 728-29.)

As the state appellate court pointed out, the jurors were instructed that they were entitled to consider that Petitioner had been convicted of selling cocaine base on a previous occasion, (assuming the prosecution had met its burden of proof that he had in fact been convicted on that occasion, which it did because Petitioner admitted during his testimony that he had suffered that

conviction), for the limited purpose of helping to decide whether Petitioner had the specific intent to sell the cocaine with respect to counts 1 and 3, or knowledge of the drug's nature. (RT 613.) The jury was immediately thereafter instructed: "You cannot consider that evidence of the uncharged offenses for any other purpose.  And, certainly not simply to conclude that Mr. Williams has a bad character or has some disposition to commit the crime." (Id.)  They were then instructed: "And, certainly, that evidence alone is not sufficient to prove his guilt of any of the crimes, the charged crimes or the lesser included crimes."  (RT 614.)  Defense counsel reminded the jury during closing argument that each count had to be proven separately (RT 651), and the jury's final substantive instruction before closing argument stated:

> It's obvious I hope to you at this point that each of the separate counts alleges a separate crime or a separate commission of the same crime on a particular date, time and place.  And particular set of circumstances.  So you have to consider each count separately; make every effort to reach a separate verdict concerning each of the counts and the lesser included charge of possession, if you reach that in your decision making concerning counts 1 and 3.  So you'll be asked to consider the law and the evidence as they relate separately to each of the counts and return a separate verdict for each count.
>
> So there may be some – several different combinations of verdicts that you may ultimately reach: [¶]  Not guilty, obviously in any of the crimes; [¶]  Guilty of some; [¶]  Not guilty of others; [¶]  Guilty of all.  [¶]  Again, you have to consider them separately.

(RT 615-16.)

Thus, the jury was carefully instructed to consider the charges separately, reminded to do so during closing argument, and provided with evidence, in addition to that otherwise supporting counts 1 and 3, that Petitioner had previously admitted to having been convicted of possession of cocaine base for sale.  The Court must presume the jurors followed their instructions.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.")  The presumption may be overcome where there is "a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).

/ / /

Petitioner contends that the juror's statements indicated that they did not in fact follow their instructions. However, as set forth above in the discussion of Claim 2, statements regarding deliberations are not admissible to impeach a jury's verdict. Nevertheless, even if the statements attributed to the jurors could be considered in the context of determining whether joinder was prejudicial, when that is properly considered with the factors arguing for and against joinder found by the appellate court (the evidence was cross-admissible, a weak case was not joined with a stronger case, and the charges were not likely particularly likely to inflame the jury against Petitioner), it does not call into question the state court finding that those factors were not outweighed by the potential spillover effect so as to render the trial fundamentally unfair. See e.g. Bean, 163 F.3d at 1084 (finding fundamental unfairness where trial court joined charges for which evidence was not cross-admissible and where the jury was repeatedly and erroneously encouraged by their instructions and the prosecutor to consider the charges in concert).

Given the large degree of deference due the state court adjudication of this claim, it is clear that Petitioner has not demonstrated that the state appellate court's opinion involved an objectively unreasonable application of clearly established federal law (assuming it is "clearly established" within the meaning of § 2254(d)(1)), which provides that when joinder of charges result in a fundamentally unfair trial in state court, federal due process is violated. In fact, this Court must give more deference to the state court's adjudication of this claim than would ordinarily be required under § 2254(d)(1), because the claim relies on a general principle of fundamental unfairness. See Woodall, 134 S.Ct. at 1705 ("[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims.") (internal quotation marks omitted).

Irrespective of whether clearly established federal law applies to this claim, the Court must also consider whether the state court's denial of Claim 1 involved an unreasonable determination of the facts in light of the evidence presented in the state court. See 28 U.S.C. § 2254(d)(2). Petitioner points to no erroneous fact-finding by the state appellate court in connection to its determination that no gross unfairness resulted because the evidence supporting the charges was cross-admissible, a weak case had not been joined with a stronger case, the

charges were not likely to inflame the jury, and "the benefits of joinder were sufficiently substantial to outweigh the possible spillover effect of the other crimes evidence on the jury in its consideration of the evidence of defendant's guilt of each of the joined charges." (Lodgment No. 6, <u>People v. Williams</u>, No. D058734, slip op. at 17.)  To the extent Petitioner challenges those findings under § 2254(d)(2), it would appear to be a challenge to the state court's legal conclusion that he had not shown his trial was rendered unfair by joinder, which is appropriately considered by this Court under § 2254(d)(1).  <u>See e.g.</u> <u>Lopez</u>, 2014 WL 4956764 at *4 (holding that a finding of inadequate notice under § 2254(d)(2) was in reality a challenge under § 2254(d)(1) to the "legal conclusion about the adequacy of the notice provided.")  In any case, as set forth above, the state court findings are well supported by the record.  To the extent Petitioner merely argues that the state court failed to correctly apply state law, Respondent is correct that he is not entitled to federal habeas relief on such a claim.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (holding that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")  The Court finds that federal habeas relief is not available under § 2254(d)(2), to the extent it applies to Claim 1, because the state court's adjudication is not based on an unreasonable determination of the facts.

Finally, assuming Petitioner could satisfy § 2254(d)(1) or (2), and assuming he could demonstrate that the failure to grant his severance motion amounted to a federal constitutional violation, the error is harmless unless he can demonstrate that it had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Bean</u>, 163 F.3d at 1086, quoting <u>Brecht</u>, 507 U.S. at 637.  Although defense counsel indicated that one or more of the jurors had admitted to using evidence on count 3 to convict on count 1, another said she felt pressure to do so, and one said it would have been difficult to convict without joinder, such testimony is not admissible to impeach their verdicts for the reasons discussed above regarding Claim 2.  Even if the statements could be considered, as just discussed, the jury could have reached the same verdicts based on properly admitted evidence regarding Petitioner's prior conviction for possession of cocaine base for sale.  The jury  rejected testimony from Petitioner and an expert witness that the amounts of drugs and money were consistent with personal use, were presented with strong

evidence of guilt, did not credit Petitioner's testimony, and, as reported by the prosecutor, the jurors stated that Petitioner received a fair trial.  Thus, even if joinder could have had some small effect or influence on the verdicts, Petitioner has not shown that such an effect or influence was "substantial" or "injurious" so as to support a finding that any error was harmful.  Brecht, 507 U.S. at 637; Bean, 163 F.3d at 1086.

Accordingly, the Court finds that the state court adjudication of Claim 1 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.  Alternately, assuming Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d)(1) or (d)(2), any federal constitutional violation was harmless.  The Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 1.

## D.      Claim 3

Petitioner, who is African-American, contends in Claim 3 that there were only two African-American prospective jurors on the panel, and although one remained and served on the jury, the prosecutor removed the other via a peremptory challenge in violation of the Equal Protection Clause of the Fourteenth Amendment.  (Pet. at 20-24.)  He alleges that the only explanation for the removal of the juror is race, and the prosecutor's stated reasons for removing the juror are unsupported by the record and a pretext for racial discrimination.  (Id.)

Respondent answers that the state appellate court's rejection of this claim, on the basis that the trial court did not err in finding that the defense failed to make a prima facie case of impermissible group bias discrimination, is neither contrary to, nor involved an unreasonable application of, clearly established federal law. (Ans. Mem. at 14-21.)  Respondent contends that the state court reasonably relied on the fact that the prosecutor had twice accepted the jury as composed prior to excusing the juror, and that the final jury contained the only other African-American juror from the original panel, and correctly credited as non-pretextual the reasons given by the prosecutor for challenging the juror.  (Id.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

/ / /

Last, Williams, who is African–American, claims the court violated his equal protection rights under the federal Constitution and committed reversible error when the defense objected under *Batson/Wheeler* to the prosecutor's exercise of a peremptory challenge to excuse prospective juror No. 7 (hereafter juror No. 7)—one of two African–American prospective jurors—and the court ruled the defense had failed to meet its threshold burden of making a prima facie case of group bias discrimination.  We reject this claim.

A.  *Background*

After the prosecutor exercised a peremptory challenge to excuse juror No. 7, defense counsel made a *Batson/Wheeler* objection.  The parties agreed that juror No. 7 was the only African–American male on the panel and that seated juror No. 10 was an African–American female.  The court stated, "Well, *I don't think at this point the threshold has been satisfied.  But if (the prosecutor) wants to state something on the record, I'll give him that opportunity* while things are fresh in everybody's mind."  (Italics added.)  The court observed that "(juror No. 7) has survived several challenges and we all understand that the—you know, the mix sort of changes as challenges occur."

The prosecutor stated, "I'd also note that several times I passed and was happy with the jury," and then gave the following reasons for having exercised the peremptory challenge to excuse juror No. 7:

"Your Honor, there were several things about (juror No. 7) that I didn't necessarily like as far as a potential juror.  Um, one being that he continually avoided making eye contact with me.  And I have been trying for the last two days to make eye contact, establish eye contact with him as I have basically with every juror seated just to see if they're willing to make eye contact with me.  He continually looks at the floor, refuses to make eye contact with me.

"I noted that he lives alone and that he's a fairly young individual.  Um, I kind of take that as an individual who's not married, doesn't have kids, doesn't have a real stake in the community.

"And, then, kind of the thing, ah, (w)hat really got to me yesterday was during the questioning of the Oceanside former police officer, the Harbor Patrol officer, um, (defense counsel) was questioning the harbor officer and asking him if he could set aside all those years of experience and be fair and impartial.  And I noted there was an audible scoff from (juror No. 7), kind of a—he looked down and kind of under his breath went (indicating).  You know, made it—and I don't know that anybody caught that but me because I was sitting so close to him.  And I was kind of watching to see what his reaction would be at that point.

"And then the last thing that I noted yesterday was that when we were discussing—either today or yesterday—when we were discussing quantities of drugs—I think (defense counsel) was again talking about quantities of drugs—(juror No. 7) had previously said he had absolutely no experience with illegal substances, with crack cocaine.  And what he said today interested me that he said it would depend on if those rocks were broken up into smaller pieces.  And for somebody who doesn't have any familiarity with crack cocaine to key in on that specific thing, smaller quantities of rocks, ah,

13cv2070

would maybe potentially give more weight to a sales charge as opposed to a possession charge, I thought that established, at least in my mind—a bell went off that maybe he has some familiarity with crack cocaine that he's not sharing with us.  Or with illegal substances.

"And, so, for those reasons, you know, I think it was a toss up with him because he did express some—some ability to, you know, assess the evidence as a whole and, you know, sit back and just listen to the evidence and make an opinion.  But . . . those stated reasons were the reasons that I decided to let . . . him go today."

The court then ruled there was no threshold showing that the prosecutor's use of a peremptory challenge to excuse juror No. 7 was racially motivated.

### B.  *Applicable Legal Principles*

The use of peremptory challenges to excuse prospective jurors solely on the basis of group bias based on membership in a racial group violates both the state and federal Constitutions.  (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.)

There are three steps in establishing a *Batson/Wheeler* claim.  First, the defendant must make a prima facie case by showing that the totality of the relevant facts gives rise to an inference of racially discriminatory purpose.  (*Johnson v. California* (2005) 545 U.S. 162, 168; see *People v. Alvarez* (1996) 14 Cal.4th 155, 193 (*Alvarez*) (a prosecutor is presumed to have exercised peremptory challenges in a constitutional manner, and the defendant bears the burden of making an initial prima facie showing of purposeful discrimination).)  Second, if the defendant meets his burden of making such a prima facie showing, the burden shifts to the People to show "permissible race-neutral justifications" for the challenge.  (*Johnson*, at p. 168.)  Last, if the People meet their burden of tendering a race-neutral explanation, the trial court then must decide whether the defendant has proven "purposeful racial discrimination."  (*Ibid*.)

The California Supreme Court has explained that "(t)he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.  (Citation.)  So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and nondiscriminatory reason for exercising the challenge."  (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)  "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory."  (*Ibid*.)

The prosecutor's explanation need not rise to a level that justifies the exercise of a challenge for cause.  (*People v. Williams* (1997) 16 Cal.4th 635, 664.)  "(A)dequate justification by the prosecutor may be no more than a 'hunch' about the prospective juror (citation), so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for race prejudice.'"  (*Ibid*.)

///

-33-

### 1. *Standard of review*

When a trial court denies a *Batson/Wheeler* motion based on its finding that no prima facie case of group bias was established, the reviewing court considers the record of the voir dire and affirms the ruling if it is supported by substantial evidence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 993.) The reviewing court "accord(s) particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand." (*Id*. at pp. 993–994.)

### C. *Analysis*

### 1. *Claim of mootness*

As a preliminary matter, we reject Williams's contention that since the prosecutor, during the hearing on Williams's *Batson/Wheeler* objection, discussed at the court's request his reasons for excusing juror No. 7, it is "irrelevant" whether the defense made a prima facie case of *Batson/Wheeler* error and, thus, "the analysis on appeal proceeds to whether there was a plausible race-neutral reason for challenging (juror No. 7) and whether substantial evidence supported those reasons." In support of this contention, Williams relies on *People v. Thomas* (2011) 51 Cal.4th 449, 473–474 (*Thomas*).

Williams's reliance on *Thomas* is misplaced. There, the Attorney General agreed that because the prosecutor presented his reasons for exercising the peremptory challenge, the issue of whether defense counsel established a prima facie case was immaterial. (*Thomas, supra*, 51 Cal.4th at p. 474.) Here, unlike in *Thomas*, the Attorney General argues the prosecutor's presentation of his reasons for excusing juror No. 7 did not render moot the question of whether Williams made a prime facie case of *Batson/Wheeler* error. Furthermore, as the California Supreme Court explained in *People v. Welch* (1999) 20 Cal.4th 701, "when . . . the trial court states that it does not believe a prima facie case has been made, and *then* invites the prosecution to justify its challenges for purposes of completing the record on appeal, the question whether a prima facie case has been made is *not mooted*, nor is a finding of a prima facie showing implied." (*Id*. at p. 746, italics added; see also *People v. Taylor* (2010) 48 Cal.4th 574, 616 ("We have found it proper for trial courts to request and consider a prosecutor's stated reasons for excusing a prospective juror even when they find no prima facie case of discrimination; indeed, we have encouraged this practice.").) Here, like the trial court in *Welch*, the court stated it did not believe the defense had made a prima facie case, and then it invited the prosecutor to justify his exercise of the peremptory challenge. We conclude the issue of whether Williams made a prima facie case is not moot and a finding of a prima facie showing is not implied. (*People v. Welch*, at p. 746; *People v. Taylor*, at p. 616.)

### 2. *Merits*

Having reviewed the record of the voir dire, we conclude substantial evidence supports the court's ruling that the defense failed to meet its threshold burden under *Batson/Wheeler* of making a prima facie case of impermissible group bias discrimination. Although Williams "is himself African–American, . . . that fact alone does not establish a prima facie case of discrimination." (*People v. Kelly* (2007) 42 Cal.4th 763, 780.) Significantly, the record shows the prosecutor twice passed on the opportunity to exercise a peremptory challenge to excuse juror No. 7, each time expressing his satisfaction with the composition of the jury notwithstanding his presence on it. These facts strongly suggest race was

not a motive for the challenge. (See *Kelly*, at p. 780 ("Here, the prosecutor used only one peremptory challenge against an African–American. He passed the alternate jurors once with two African–American jurors remaining, and he never challenged the other African–American juror. The fact that the prosecutor accepted the jury panel once with both African–American jurors on it, and exercised the single challenge only after defense counsel exercised his own challenge, strongly suggests that race was not a motive behind the challenge.").)

In addition, as Williams acknowledges, a female African–American was seated on the jury when the prosecutor accepted its ultimate composition. This fact also strongly supports the court's finding that Williams failed to meet his burden of showing race was a motive behind the prosecutor's decision to excuse juror No. 7. (See *People v. Taylor, supra*, 48 Cal.4th at p. 614 ("That the prosecutor excused a single African–American prospective juror, without more, does not support the inference the excusal was based on race, especially given defendant's acknowledgment during the hearing that another African–American woman then was seated on the jury.").) Although this fact is not conclusive, it is an indication the prosecutor acted in good faith when he challenged juror No. 7. (See *People v. Ward* (2005) 36 Cal.4th 186, 203 ("'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.'").)

We need not reach the merits of Williams's claim that a comparative analysis of the voir dire responses given by other prospective jurors who were ultimately seated supports his *Batson/Wheeler* claim. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 350 ("Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his (or her) strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis here.").)

For all of the foregoing reasons, we conclude the court did not err in ruling that Williams failed to meet his threshold burden under *Batson/Wheeler* of making a prima facie case of impermissible group bias discrimination.

(Lodgment No. 6, <u>People v. Williams</u>, No. D058734, slip op. at 18-36.)

Clearly established federal law provides that "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." <u>Batson</u>, 476 U.S. at 88. The <u>Batson</u> inquiry consists of three steps, which the Supreme Court has recently indicated, "should by now be familiar":

First, the defendant must make out a prima facie case by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

1  Johnson v. California, 545 U.S. 162, 168 (2005) (internal citations, quotation marks and footnote

2  omitted).

3      "[A] defendant satisfies the requirements of Batson's first step by producing evidence

4  sufficient to permit the trial judge to draw an inference that discrimination has occurred." Id.

5  at 170.  The state court correctly observed that the prosecutor twice accepted the jury as

6  composed while it still included the later-challenged juror.  Although that behavior can support

7  an indication there was no discriminatory animus toward the juror, it will not refute, if one has

8  been shown, an inference that the challenge was motivated by race.  See Williams v. Runnels,

9  432 F.3d 1102, 1109 (9th Cir. 2006) ("It is true that the prosecutor accepted the jury, including

10  African-American members, several times before he exercised his first peremptory challenge.

11  This, however, does not refute the inference that when the prosecutor did make peremptory

12  challenges, he did so in a purposefully discriminatory manner as evidence by his use of the three

13  of his first four peremptory challenges to dismiss African-American jurors.")  As discussed

14  below, however, no inference of discriminatory animus has been shown here.

15      In addition to the fact that the prosecutor twice accepted the jury with the challenged juror

16  seated, the only other African-American prospective juror sat on the jury and was not challenged

17  by the prosecutor.  Although that factor alone does not preclude a finding of discriminatory

18  animus, it was properly considered by the state court.  See Palmer v. Estelle, 985 F.2d 456, 458

19  (9th Cir. 1993) ("[A] trial court may not rely solely on the fact that some Blacks remain on a jury

20  after selection is complete.  A trial court may, however, take into account a prosecutor's

21  acceptance of Black jurors when determining whether the prosecutor has intentionally

22  discriminated against Blacks.") (internal citation omitted); Fernandez v. Roe, 286 F.3d 1073,

23  1079 (9th Cir. 2002) ("That one Hispanic juror remained on the jury, though helpful to the State,

24  is not dispositive.")

25      Thus, the Court finds that the facts relied on by the state court to conclude that Petitioner

26  had failed to show that the prosecutor acted from a racially-discriminatory bias in challenging

27  the prospective juror are supported by the record.  However, before determining whether the

28  state appellate court's legal conclusion (that Petitioner did not establish a prima facie case of

racial discrimination) comports with clearly established federal law, the Court will consider Petitioner's contention that the reasons given by the prosecutor are not supported by the record and are a pretext for racial bias. See Johnson, 545 U.S. at 170 ("[W]e assumed in Batson that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated.")

The second Batson step requires that "once the defendant has made out a prima facie case, 'the burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." Johnson, 545 U.S. at 168, quoting Batson, 476 U.S. at 94. "Those justifications need not have been 'persuasive, or even plausible'"; at the second step of Batson, 'the issue is the facial validity of the prosecutor's explanation." Castellanos v. Small, 766 F.3d 1137, 1147 (9th Cir. 2014), quoting Purkett v. Elem, 514 U.S. 765, 768 (1995).

The first reason given by the prosecutor was the prospective juror's failure to make eye contact. The prosecutor stated: "And I have been trying for the last two days to make eye contact, establish eye contact with him as I have basically with every juror seated just to see if they're willing to make eye contact with me. He continually looks at the floor, refuses to make eye contact with me." (RT 278-79.) Although the record contains only the prosecutor's representation in this regard, Petitioner points to nothing in the record to refute it, and neither the trial judge nor defense counsel contradicted the statement. It was objectively reasonable for the state appellate court to find this reason to be race-neutral. See Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999) (finding that a juror's failure to make eye contact was a race-neutral reason for exercising a peremptory challenge), citing United States v. Changco, 1 F.3d 837, 840 (9th Cir. 1993) ("(P)assivity, inattentiveness, or inability to relate to other jurors . . . [have been repeatedly upheld as] valid, race-neutral reasons for excluding jurors.").

The prosecutor's second reason, that the prospective juror was young, unmarried, childless and living alone, and therefore may not have strong ties to the community, is supported by the record. (See RT 45: "I live alone so I have no children. Or -- I'm not married.") In a case such as this, where Petitioner was facing a potential sentence in excess of fifteen years for

possession for sale of a relatively small amount of cocaine base, it was reasonable for the state appellate court to consider the prosecutor's stated reason to be race-neutral and insufficient to support a finding of discrimination.  See Rice v. Collins, 546 U.S. 333, 341 (2006) ("It is not unreasonable to believe the prosecutor remained worried that a young [single] person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of a controlled substance.")  Petitioner points out that the prospective juror indicated that he had a large family.  (Pet. at 21.)  However, as set forth below, there is no indication in the record that his relatives lived in the community.  It was objectively reasonable for the state appellate court to find this reason to be race-neutral.  See Hernandez v. New York, 500 U.S. 352, 369 (1991) ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.")

In explaining his third reason, the prosecutor stated:

> And, then, kind of the thing, ah, that really got to me yesterday was during the questioning of the Oceanside former police officer, the Harbor Patrol officer, um, [defense counsel] was questioning the harbor officer and asking him if he could set aside all those years of experience and be fair and impartial.  And I noted there was an audible scoff from [the juror], kind of a – he looked down and kind of under his breath went (indicating).  You know, made it – and I don't know whether anybody caught that but me because I was sitting so close to him.  And I was kind of watching to see what his reaction would be that point.

(RT 279.)

As with the juror's failure to make eye contact, there is nothing in the record to refute the prosecutor's characterization of the juror's negative reaction to the former police officer's representation that he could be fair and impartial despite years of police experience.  It is not an objectively unreasonable application of clearly established federal law for the state court to find that the prosecutor offered a race-neutral reason based on the juror's perceived negative attitude towards a former law enforcement officer's ability to be fair and impartial.  See Scott v. Krammer, 516 Fed.Appx. 612, 613 (9th Cir. 2013) (finding that even to the extent a negative attitude toward law enforcement could be considered a proxy for race, the United States Supreme Court has never held that Batson prohibits basing peremptory challenges on proxies for race, and therefore § 2254(d)(1) precludes federal habeas relief on such a claim), citing Hernandez, 500

1    U.S. at 371-72 (discussing but not deciding whether <u>Batson</u> encompasses a prohibition against

2    basing peremptory challenges on proxies for race.)  The state appellate court's determination that

3    this reason did not raise an inference of bias is not objectively unreasonable.

4           The final reason given by the prosecutor was:

5                 And then the last thing that I noted today was that when we were discussing
      – either today or yesterday – when we were discussing quantities of drugs – I
6    think [defense counsel] was again talking about quantities of drugs – [the juror]
      had previously said he had absolutely no experience with illegal substances, with
7    crack cocaine.  And what he said today interested me that he said it would depend
      on if those rocks were broken up into smaller pieces.  And for somebody who
8    doesn't have any familiarity with crack cocaine to key in on that specific thing,
      smaller quantities of rocks, ah, would maybe potentially give more weight to a
9    sales charge as opposed to a possession charge, I thought that established, at least
      in my mind – a bell went off that maybe he has some familiarity with crack
10   cocaine that he's not sharing with us, or with illegal substances.

11   (RT 279-80.)

12          Petitioner contends the prosecutor's reason lacks a factual basis in the record, as the juror

13   never used the word "rocks," but merely said, "as anyone might, that drugs not parceled out

14   might more likely be for sale."  (Pet. at 23.)  Petitioner argues that he met his burden in state

15   court of demonstrating a prima facie case of discrimination by showing:

16                that the challenged African-American juror was an educated law-abiding person
      with dozens of close relations in the community, and nothing to indicated he was
17   hiding drug experience.  If anything, he had a slight pro-prosecution bias for
      purposes of this case, as he said he might consider broken-up drugs to show intent
18   to sell, more than if (as he awkwardly described it) appellate had one "sack" of
      cocaine.  No one experienced in drugs uses the "sack" for anything, and the entire
19   record belies the prosecutor's claim of race-neutral motives.

20   (Pet. at 21-22.)

21          The prospective juror answered the initial questioning by the trial judge:

22
      A:    [I'm] a bioengineer consultant.  [¶]  My client company is General
23          Tech in Oceanside.  [¶]  I live alone so I have no children.  Or -- [¶]
            I'm not married.  [¶]  And I have not served on a jury before.  [¶]
24          And I know maybe one or two [persons in law enforcement or the
            legal profession] but I don't even talk to them that much.  One in
25          New York.  My friend is a lawyer in New York, so that's it.

26   Q:    Have you been the victim of a crime?

27   A.    Yeah, in college.  I got my place broken into with me and my
            roommates.
28

                                            -39-                                    13cv2070

1    Q.    Have you appeared in court as a party or a witness?

2    A.    Ah, just in traffic court.

3    Q.    You or anybody close to you been arrested or accused of a crime?

4    A.    Just an old college friend.  He served time before, so –

5    Q.    Do you have any feelings that he was treated unfairly?

6    A.    He was treated fairly.  He was in possession, so –

7    Q.    Drugs?

8    A.    Yes.

9    Q.    Well, this case involved allegations of possession of cocaine base,
         either simple possession as I referred to it or possession for sale.
10        Do you think –

11    A.    I can be impartial.

12  (RT 45.)

13        When asked by defense counsel about his feelings regarding the use of friends and

14  support groups to help someone to get over the problems of past drug use, he said:

15    A:    You know, I have a huge family and they're overly loving and
16        supportive.  They've provided my brother and myself, my youngest
         brother and myself, my youngest brother and my 36 cousins all with
17        the same support.  So it does help tremendously, but a person's also
         going to maybe desire help.  Gets to a point where they hit rock
18        bottom and say they want help.  Lucky for him.

19    Q:    Would you – thank you.  [¶]  Would you agree that everyone who's
20        got drugs on them is obviously using them?

21    A:    No.  Some people are selling them.

22    Q:    I was getting there.  [¶]  Someone's got them in their pocket.  Then
         they're using them and they're selling them?  It's a foregone
23        conclusion in your mind, kind of, what –

    A:    No.  I mean –

24    Q:    You got it.  If you got money.  You got drugs.  You got the stuff to
25        do it with.  You got to be selling it.

26  ///

27  ///

28  ///

-40-

13cv2070

A:      Kind of basic.  I'm not buying drugs, you know?  And the whole situation is – I wouldn't make a judgment right away, no.  You have to hear how it happened; when it happened; all the facts before you come –

(RT  74-75.)

The following exchange occurred the next day with defense counsel pursuing a line of questioning regarding whether there was any particular amount of drugs which the prospective jurors would consider as too much to be consistent with possession for personal use, and be indicative of possession for sale:

Q:      Is there a certain point where you start feeling a little uneasy, like, you know, okay, a gram, two grams or two – they call them rocks. So it's not – you know, its like in rock –

The Court:    I think "a little uneasy" is a little vague.

Q:      Well, to the point where it rises where you start to feel, "You know what? I'm getting a little biased, a little prejudiced where I won't be fair."  So it's a feeling you get maybe that, you know, one or two rocks maybe would be personal.  But if you've got a whole 10, 15 of them, it can't be personal.  [¶]  Is there a certain limit that you would put on something like that, sir?

[Prosecutor]: Your Honor, I think we've already covered this with this juror.

The Court:    I think so.  [¶]  We're not asking you to prejudge the case.  I think it's just is there some defined quantity that is going to cause you to sort of automatically decide it's for sale rather than personal use?  Is there some bright line in that regard?

A:      If he has like eight grams and eight guys like a gram each, so to split up in different parts, then obviously people would come to the assumption he's, like, selling.  But if it's just one full sack, then maybe not.  But if you have cash – it all depends on the situation.

Q:      There's the assumption part that I wanted to sort of work here. Because the assumption is the prejudice and bias.  Therein lies the presumption of this taking off into, well, those are the facts.  I assume if he's got cash, well, it's related to drugs because that's how it works.  [¶]  But some people don't use a checking account, you know?  I mean, there are certain ways that people carry cash in the old days.  I mean, regularly carries hundreds of thousands. Nobody carries it now.  Everybody carries a bank card.

The Court:    What's your question, [defense counsel]?

///

-41-

13cv2070

Q:   So my question is:  The cash would be a factor?  If someone had a large amount of cash, you would be a little bit assumptive?

A:   Cash individually on drugs, then, yes.

Q:   Well, no.  In your pocket.

A:   In your pocket.  That's what I mean.

Q:   Fair enough.

(RT 118-20.)

When the prospective juror was asked by the prosecutor about his initial comment that he knew someone involved with drugs:

A:   A good friend.  A girl came from New York and we all hung out together.  We didn't live together.

Q:   You had no idea he was selling drugs?

A:   Not – he never sold it in front of me.  I didn't know – he just maybe here and there, little things here and there.  [¶]  But he did federal time, so, obviously, he's got – it was a lot.

Q:   What kind of drug was it?

A:   I think it was "Ecstasy" pills and some cocaine.

Q:   Was he also using the drugs?

A:   He wasn't really using it that much.  Maybe once in awhile.  He wasn't, like, an addict.

Q:   So using a little bit and selling, making some money.

A:   Yes, pretty much.  Because he was 20, so –

(RT 147.)

Later, this exchange took place between the prospective juror and the prosecutor:

Q:   Okay.  I think somebody mentioned yesterday – somebody said yesterday that there was a difference between an addict and somebody who deals.   And just because you mentioned that addiction and kind of your experience with addiction made me think of that.  [¶]  Was that [Juror]?  Was that something you said?

A:   My friend, he dealt but he wasn't an addict.

Q:   An addict.  You said there was a difference – right? -- between the two.

-42-

1      A:      For him there was a difference.

2      Q:      Do you think there's always a difference?

3      A:      Depends on the situation.

4 (RT 260.)

Based on the forgoing review of the record, there is clear support in the record for the prosecutor's statement that the prospective juror drew a distinction between possession for personal use and possession for sale based on whether the drugs were divided into smaller quantities. Even assuming Petitioner is correct that there is a tenuous connection between the juror's expression of that distinction and the prosecutor's concern that the juror had some familiarity or experience with drugs which he had not disclosed, there is nothing inherently racial about the reason given. Hernandez, 500 U.S. at 360 (stating, with respect to step two of the Batson inquiry, that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.").) The cold record cannot adequately convey the circumstances which were present in the courtroom which gave rise to the trial judge's finding that the prosecutor's motive in challenging the juror was genuinely race-neutral, as this Court "is not as well positioned as the trial court is to make" that determination. Miller-El v. Cockrell, 537 U.S. at 339. Rather, the Supreme Court has indicated that:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

Hernandez, 500 U.S. at 365, quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985).

Petitioner argues that the juror's commonsense belief that divided-up drugs are more likely to be for sale than for personal use does not support a finding that he might not have been completely forthcoming about his drug knowledge or experience, and the only explanation is that the prosecutor based his challenge on the prospective juror's appearance, which Petitioner describes as "Rastafarian-appearing." (Pet. at 20-23.) When defense counsel described the juror at trial in the same manner, the trial the judge replied: "I don't know that it's Rastafarian," to

which defense counsel stated, "Whatever you call it. Long hair, braided." (RT 282.) Petitioner contends this is a classic case of excluding an African-American juror on the false assumption he would be biased in favor of an African-American defendant, as the excused juror is a respectable bioengineering consultant with little appearance of anti-prosecution bias "except for being African-American and sporting dreadlocks." (Pet. at 24-25.)

To the extent Petitioner seeks to use the prospective juror's appearance as a proxy for race, as set forth above, there is no clearly established federal law which provides that Batson can be satisfied in that manner. Hernandez, 500 U.S. at 371-72. Such a charge is in any case belied by the fact that the prosecutor twice accepted the jury with the challenged juror, and by the fact that an African-American juror sat on the final jury. The prosecutor was entitled to rely on the "bell [that] went off" in his head regarding the prospective juror's forthrightness regarding his experience with drugs. Burks v. Borg, 27 F.3d 1424, 1429 & n.3 (9th Cir. 1994) (noting that prosecutor's evaluation of a juror's demeanor, tone, and facial expression may lead to a "hunch" or "suspicion" that the juror might be biased, and that a peremptory challenge based on this reason would be legitimate.), citing, J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 148 (1994) (O'Connor, J., concurring) ("[A] trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses, derived from a juror's responses at voir dire or a juror's 'bare looks and gestures.'"); United States v. Bauer, 84 F.3d 1549, 1555 (9th Cir. 1996) ("Peremptory challenges are based upon professional judgment and educated hunches rather than research."). The appellate court's finding that the second Batson step had been satisfied because the prosecutor gave facially race-neutral reasons for exercising the peremptory strike is objectively reasonable. See Rice, 546 U.S. at 338 ("[A] federal habeas court can only grant [the] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge."); Miller-El v. Cockrell, 537 U.S. at 339 ("[A] state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference," which "is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations.")

Petitioner also contends that the prosecutor's stated fear that the prospective juror had knowledge or experience with cocaine is suspect because the prosecutor did not challenge several jurors who admitted during voir dire of having knowledge or experience with cocaine. See Boyd v. Newland, 467 F.3d 1139, 1145 (9th Cir. 2006) (holding that "comparative juror analysis is an important tool that courts should utilize in assessing Batson claims.")  However, the prosecutor's stated reason did not rely on an objection to the prospective juror's knowledge or experience with cocaine, but a hunch that the juror had failed to report such knowledge.

The third Batson step provides that "'[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" Johnson, 545 U.S. at 168, quoting Purkett, 514 U.S. at 767.  While the second Batson step looks to the reasonableness of the asserted nonracial motive, step three turns on the genuineness of the motive.  Purkett, 514 U.S. at 769.  The Court may consider any "relevant circumstances" which bear on the issue of whether the prosecutor used the peremptory challenges with a racially discriminatory intent.  Batson, 476 U.S. at 96.

Petitioner argues that the reasons given by the prosecutor were not genuine because they were not supported by the record, particularly the last reason, which he contends the prosecutor said was the deciding factor.  As set forth above, however, the record supports the prosecutor's reasons.  Although the last reason relies on a somewhat tenuous connection between the prospective juror's belief that whether the pieces of cocaine were broken up or together was relevant to personal use or sales, and the prosecutor's hunch that the juror was not forthright about his knowledge or experience with rock cocaine, there is nothing in the record to support a finding that the reason was not genuine.  Rather, the genuineness of the reason is supported by the fact that the prosecutor twice accepted the jury with the prospective juror seated, and the jury contained another African-American juror.  Even if this Court would find, on the cold state court record, that factual support for the last reason given by the prosecutor is unpersuasive, given the deference this Court owes to the findings of the state trial and appellate courts, and given all the factors supporting a finding of race-neutrality, it is clear that the appellate court's finding that the juror was not dismissed for racially motivated reasons was neither contrary to, nor involved

an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the record.  See Richter, 131 S.Ct. at 786-87 (holding that the AEDPA deferential standard of review "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents. . . . [and] is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).  Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 3.

# VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

**IT IS ORDERED** that no later than **January 6, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 16, 2015.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED:**   December 19, 2015

_____
**HON. JILL L. BURKHARDT**
**UNITED STATES MAGISTRATE JUDGE**

CC:      ALL PARTIES